**Peter Garcia**
**2030 Stone Cross Circle**
**Orlando, FL  32828**
**clintonville@gmail.com**
**321-400-5758**



U.S. DISTRICT COURT
BANGOR, MAINE
RECEIVED AND FILED

2018 JAN 12  P 1: 22

BY _____
DEPUTY CLERK

## THE UNTIED STATES DISTRIT COURT

## FOR THE DISTRICT OF MAINE

PETER GARCIA,

       Petitioner,

vs.

MaineGeneral Health

       Respondents

Case No. _____

COMPLAINT AND DEMAND FOR

JURY TRIAL

## **COMPLAINT**

Petitioner, Peter Garcia, by way of this Complaint, alleges Respondent MaineGeneral

Health (Medical Center) discriminated against him based on a physical disability, age and then

retaliated against him in violation of the Americans with Disabilities Act (ADA) Title I

of 1990, 42 U.S.C. § 12112 et seq. Petitioner was offered and accepted an employment

contract with MaineGeneral.  However before employment could begin a series of actions by

MaineGeneral in conjunction with the Maine Board of Medicine prevented Petitioner from

beginning employment and MaineGeneral canceled the employment contract.  The actions

taken by MaineGeneral were discriminatory in nature and constituted a breach of contract. Any

rational provided by MaineGeneral for canceling the employment contract is pretext presented

in an effort to conceal the discriminatory intent and actions of MaineGeneral and the Board of

Medicine employees.

Page **1** of **22**
                    Complaint
             Peter Garcia v MaineGeneral Health

## JURISDICTION AND VENUE

1) This court has jurisdiction under 28 U.S.C.1331 for civil actions arising under the laws of the United States; and 42 U.S.C. §12112 et seq., and more specifically 42 U.S.C. § 12112 (b)(5)(A) and 42 U.S.C. § 12112 (b)(5)(B), Title I of the American Disabilities Act (ADA) of 1990.  Venue is proper in the Judicial District pursuant to 28 U.S.C. 1391(b)(2) in that the acts of discrimination occurred in this Judicial District.

## ADMINSTRATIVE EXHAUSTION

3) Plaintiff timely filed this Complaint after receiving a right to sue letter from the appropriate administrative agencies.

## PARTIES

4) Petitioner, Peter Garcia, is a resident of Orange county Florida, and was so at the time of the discriminatory events. He is a board certified Family and Emergency Physician. He has a physical disability as recognized by the American Disabilities Act.

5) Respondent, MaineGeneral Health, is a Maine corporation, and at all material times has more than 50 employees. The address of MaineGeneral is 35 Medical Center Parkway, Augusta, ME   04330.

## THE LAW

6) Title I of the ADA prohibits employers, employment agencies …from discriminating against qualified persons with disabilities with regards to all aspects of employment including the application process, 42 U.S.C. § 12112(a).

7) Subtitle A of title II of the Americans with Disabilities Act of 1990 ( 42 U.S.C. 12131-12134), as amended by the ADA Amendments Act of 2008 (ADA Amendments Act)

( Pub. L. 110-325, 122 Stat. 3553 (2008)), prohibits discrimination on the basis of disability by public entities.

8) Under Title I of the ADA, employers and other covered entities are required to make reasonable accommodation to the known physical or mental limitation of an applicant or employee unless undue hardship can be demonstrated, 42 U.S.C. § 12112 (b)(5)(A). In addition 42 U.S.C. § 12112 (b)(5)(B) prohibits denying employment opportunities to a job applicant who is otherwise a qualified individual with a disability if such denial is based on the need of such covered entity to make reasonable accommodation.

9) More specifically  42 U.S.C. ch. 126 § 12101 (a)(5) addresses paternalism and states," Individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, *overprotective rules and policies*…"

10) Overprotective rules and policies also known as paternalism. The ADA was designed in part to prohibit discrimination against individuals with disabilities that takes the form of paternalism. Americans with Disabilities of 1990, § 2(a)(5), 42 U.S.C.A. § 12101(a)(5).

11) In order to establish a prima facie case of discrimination under the ADA, the plaintiff must prove, by a preponderance of the evidence: (1) that he or she has a disability within the meaning of the ADA; (2) that he or she is qualified, or able, to perform the essential functions of the position with or without reasonable accommodation; and (3) that the employer took an adverse employment action against him or her in whole or in part because of the protected disability.

12) An individual is considered to have a disability under the ADA in three separate instances: (1) if he or she has a "physical or mental impairment that substantially limits

one or more of the major life activities of such individual;" (2) if he or she has a "record of" having such a physical or mental impairment; or (3) if he or she is "regarded as" having such an impairment.

## COMMON FACTS FOR ALL CLAIMS

13) During late February 2017 Peter Garcia, MD, JD, (petitioner) applied for the Medical Director of Augusta Family Medicine which is part of MaineGeneral Health (Medical Center).

14) He initially had contact with a recruiter for MaineGeneral, Tiffany Parker regarding the position.

15) After initial contact with the recruiter a phone interview was arranged with Benjamin Brown, MD (Brown), Primary Care Medical Director, which occurred on or about March 8, 2017.

16) Petitioner was invited to an onsite interview which occurred on April 11, 2017.

17) References were submitted to Steven Diaz, MD (Diaz), Medical Director of Physician Practices for MaineGeneral on or about May 1, 2017.

18) Diaz communicated with the submitted references and commentary by the references was very positive.  MaineGeneral was satisfied with the references submitted and their comments. (See Diaz email dated May 25)

19) After additional phone conversations with Diaz and Brown an Offer of Employment was extended to petitioner on May 17, 2017. (Attachment A) Petitioner signed and returned the Offer of Employment to MaineGeneral.  Several weeks later a contract was offered which petitioner signed and returned to MaineGeneral as well.  (Attachment A)

Complaint
Peter Garcia v MaineGeneral Health

20) The offer of employment and an employment contract by MaineGeneral demonstrates that MaineGeneral felt petitioner was a qualified individual with regards to job performance and as defined by the ADA.

21) As part of the employment process petitioner applied for a Maine Medical License with the Maine Board of Medicine. (Board)  A license to practice medicine in Maine was a requirement of petitioner's employment.

22) MaineGeneral was aware that petitioner did not have a Maine Medical License at the time he accepted employment and it would be at least 3 months before he might obtain a license once he began work.

23) MaineGeneral though Diaz and Brown both acknowledged petitioner could begin work before he had obtained an unrestricted Medical License. July 1, 2017 was selected as a preliminary start date.

24) Petitioner had not actively practiced clinical medicine for a period of approximately eight years as a result of his disability although he was active other medical activities. (See Letter to Board of Medicine June 15, 2017 Attachment C)

25) As part of the application for a Maine Medical License petitioner was required to produce letters from three physicians who would acknowledge his clinical proficiency.

26) Although petitioner's references were excellent none had witnessed his practice of medicine and were not appropriate for the Board's requirements.

27) MaineGeneral through Diaz and Brown agreed to provide a preceptor arrangement that would produce the letters needed by the Board to complete his application for a Medical License.   The preceptor program would take place at Augusta Family Medicine. (See Diaz Letter of June 6, 2017 and July 27, 2017)(Attachment B)

28) A meeting with Diaz and Brown occurred in Diaz's office on May 5, 2017. The majority of the meeting was spent discussing a plan that Diaz had designed to create the needed letters for the Board and satisfy its requirements for petitioner to obtain a Maine Medical license.

29) The Diaz plan was created without consultation with petitioner and without ever meeting him.   The "need" for such a plan came out of conversations between MaineGeneral employees and Board of Medicine employees before petitioner arrived in Maine. These discussions between MaineGeneral and the Board were the first expression of the paternalistic thoughts of Diaz, MaineGeneral and the Board which embodied the common perceptions regarding older and disabled employees that they are inferior and nonproductive.

30) There was no effort on the part of Diaz or Brown to determine the current medical skills of petitioner before proposing a plan.   The plan was the result of his own bias and prejudices.   There was no mention at any time that MaineGeneral would not follow the contract that had been signed and pay petitioner for his time at the contact rate when he began the supervised reentry to clinical practice (reentry) experience.

31) Petitioner was aware that some monitoring of his practice skills would be needed at the onset of his employment.   He felt any monitoring could occur on site at Augusta Family Medicine and be no longer that one or two months. Several physicians were available on site to work with him.

32) The Diaz plan called for six months of daily chart reviews with several rotating physicians.   There was no mention of a reduction in the number of patients seen each

Complaint
Peter Garcia v MaineGeneral Health

day when compared to other physicians. Therefore the expected workload was the same for petitioner as with other physicians.

33) Petitioner felt the Diaz plan was much longer than needed and lacked personal observation of petitioner's practice skills, which he felt was important. Therefore on June 9, 2017 petitioner met with Timothy Terranova, Assistant Director of the Board.  He did so in an effort to craft his own plan for reentry to clinical practice. A letter acknowledging the meeting and suggestions made by Terranova are included.   (June 15, 2017 Attachment C)  The criteria which the board of medicine was to use in determining the appropriate "reentry to practice" experience are attached. (Attachment C) Later it became very clear the Board ignored its own criteria for a reentry program adopting the paternalistic thoughts of MaineGeneral.

34) It is important to note that the Maine Board of Medicine has in the past routinely issued a temporary medical license so that the reentry experience for an application away from clinical medicine for a period of time could begin.  Petitioner's expectations were that the Board would comply with his request to be treated in a similar manner.  Despite several requests and submission of all appropriate forms, this has not happened. To date petitioner has been denied the benefits afforded others in a similar situation by the Board, a public agency.

35) Petitioner's background should have qualified him for the briefest observation of his practice patterns.  These factors are discussed in petitioner's letter to the Board on June 15, 2017. ( June 15, 2017)(Attachment C)

36) The plan by petitioner could be completed in much less time when compared to MaineGeneral's plan and included direct supervised time which was important to the

Board.  It was more efficient and cost effective than the plan by MaineGeneral.  It included personal observation of petitioners practice skills which was absent from MaineGeneral's plan. The six month timeline proposed by Diaz was burdensome and arbitrary. It was based on generalizations and not rely on any specific testing or observations of petitioner and ignored petitioners background and excellent references. MaineGeneral via Brown was immediately critical of the plan petitioner submitted to the board. (Email From Brown June 15, 2017)

37) The Board of Medicine was scheduled for a meeting in early July to make a decision regarding petitioner's ability to obtain a Maine Medical License. By that time petitioner had signed his contact, had a pre-employment physical and submitted aspects of the initial employee paperwork.

38) Brown spend a significant amount of time communicating with Board employees prior to the Board's decision regarding what he felt was the best strategy regarding a remedial preceptor plan for petitioner.  He did so without the knowledge or consent of petitioner. At no time did he communicate with petitioner in an effort to determine petitioner's skills or obtain petitioner's opinion regarding what he felt was best.  Neither MaineGeneral nor the Board communicated with petitioner regarding the need or rational for such a program before the process of defining a plan began.  This is further evidence of the discriminatory "benevolent" paternalism which permeated MaineGeneral's and the Board's efforts. ( Letter of July 5, 2017  Attachment C.

39) Prior to the Board meeting in early July MaineGeneral completely changed its plan to return petitioner to clinical practice.  In addition to the supervised daily chart review for 6

months, MaineGeneral now proposed to send petitioner to a physician evaluation program for an off site evaluation of his practice skills.

40) Brown on behalf of MaineGeneral medical leadership contacted LifeGuard a program in Harrisburg, Pennsylvania that evaluates physician practice skills.   These types of programs which exist in many places cater to physicians who have lost their licenses based on behavior issues or chemical dependency.  As a group they essentially have no experience with physicians who could not practice for a period of time due to a physical disability.  There is no evidence to suggest LifeGuard was any different. Cost for the 3 to 4 day program would be between $7,000 to $10,000.  The site was picked by Brown based on Google search and no personal knowledge about any aspect of the program.

41) In his email of June 20, 2017 Brown clearly identifies that it was MaineGeneral medical leadership that devised the off site evaluation citing the inability to provide such an evaluation in Augusta at MaineGeneral.   A clear change in thought expressed in the hiring process.

42) At no time before the announcement of the changes in the Diaz plan did Brown or Diaz discuss with petitioner why such a program was needed.  Petitioners' background and references were excellent.  His medical knowledge and his ethics were praised by his references. MaineGeneral extending an offer of employment and a contract can only be viewed as reaffirmation of petitioner's qualifications and ability to practice medicine with or without accommodations.

43) In emails to Tracy Morrison on June 21 and June 28, 2017 petitioner voiced opposition to the proposed off site evaluation proposed by MaineGeneral.

Complaint
Peter Garcia v MaineGeneral Health

44) It was apparent to the Board that two very different programs had been proposed regarding petitioner's Return to Practice Program when the Board made a decision regarding a program for petitioner. (emails June 21 and 28)

45) Petitioner objected to this plan and an offsite evaluation for reasons noted in his July 5, 2017 letter to the Board. (Attachment C) Petitioner considered these practice evaluation programs to be expensive and unproven.

46) Petitioner requested the ability to attend the Board meeting at which his application was discussed to answer any questions. *His request to attend the meeting was denied by the Board of Medicine without explanation.* A clear example that the Board had adopted the paternalistic thoughts of MaineGeneral and was not interested in any information to the contrary. The Board perpetuated the thoughts of inferiority and nonproductivity which were part of MaineGeneral's beliefs regarding petitioner.

47) In an email on July 11, 2017 Morrison informed petitioner that the Board had accepted MaineGeneral's plan disregarding his own and that an outside evaluation would be needed. There was no explanation regarding what factors were felt to justify such a program by members of the Board.

48) When Diaz and Brown proposed an outside evaluation of petitioner's practice skills they were very clear that MaineGeneral would pay for the program, pay for travel and pay a salary when petitioner was on site performing the evaluation. Those assurances were made in person and in several emails. (See Brown email June 20 and July 11, 2017)

49) To comply with the Board's directive and MaineGeneral's wishes petitioner made preliminary application to Florida CARES in Gainesville, Florida as a substitute program

rather than Lifeline which had been considered previously. There was no objection to this by MaineGeneral.

50) In mid July petitioner had in place a workable plan that would lead to his medical license in Maine and employment at MaineGeneral.  MaineGeneral had proposed a plan, convinced the Board it was needed and agreed to pay for it.

51) In emails between Diaz and petitioner, Diaz indicated a need to negotiate a new contract which would have paid petitioner much less during the remedial preceptor period. Diaz attempted to coerce petitioner into signing the new agreement as he felt petitioner's time was less valuable than other physicians. (email July 20, 2017)

52) MaineGeneral was attempting to discourage petitioner from continuing to pursue employment unless he was willing to be paid less that his peers for doing the same work.

53) Diaz then attempted to convince petitioner that petitioner could pay for the external evaluation with funds that could be provided through a retention bonus for signing his contract.   Under this scenario petitioner would be paying for the experience MaineGeneral had insisted on and always stated they would pay for.

54) All physicians at MaineGeneral are eligible for a retention bonus. None have been compelled to pay for experiences MaineGeneral unilaterally believed important. This is simply one more example of the discriminatory and paternalistic thought process demonstrated by MaineGeneral. It is clear at this point MaineGeneral had made a decision that it was no longer interested in employing petitioner and they were looking for a way out of the signed contract.

55) After petitioner refused to void his original contact and refused to pay for the external evaluation that MaineGeneral had insisted on Diaz now stated that MaineGeneral would no longer pay for the external evaluation experience that they alone had felt was needed.   This was in contrast to the multiple assurances petitioner had previously received that MaineGeneral would pay for the experience.

56) Without discussion MaineGeneral changed its position with regards to payment for the external evaluation experience after petitioner addressed the complete issue in his email of July 20, 2017.

57) Diaz attempted to justify nonpayment of the external evaluation experience by stating that "Stark Laws" prevented MaineGeneral from honoring the contract they had entered into to pay for the external evaluation. The use of "Stark Laws" to justify nonpayment of the evaluation that MaineGeneral had insisted on and promoted to the Board is a clear misapplication of the law as noted in petitioner's letter to Diaz of August 8, 2017. (Attachment D)

58) On or about July 24, 2017 a meeting occurred in the office of Marci Alexander, Esq., (Alexander) General Counsel for MaineGeneral. The meeting occurred at the request of petitioner.   Although Diaz had not been originally invited he joined the meeting prior to its conclusion.

59) The purpose of the meeting was to discuss the claim that "Stark Laws" prevented MaineGeneral from paying for the experience they had convinced the Board of Medicine was needed. Petitioner's ability to obtain a Medical License in Maine within a limited time span was now directly tied to the external evaluation MaineGeneral had proposed and convinced the Board of Medicine was needed.

60) MaineGeneral had also agreed to provide the three letters of reference requested by the Board. MaineGeneral was keenly aware that it would be almost impossible for petitioner to replicate this situation.

61) MaineGeneral understood the easiest way to avoid the contract with petitioner was to impair and delay his ability to obtain a medical license as this was a requisite to the employment contract that had been signed between petitioner and MaineGeneral.

62) At the meeting with Alexander petitioner voiced skepticism that Stark was in any way relevant to the current situation. This is expressed in more detail in his letter of August 7, 2017.  MaineGeneral never presented any proof that their claims regarding Stark were valid.  Thus the "Stark" defense must be viewed as a pretext.

63) In an effort to avoid any Stark controversy petitioner offered several solutions including a separate independent contact for the external evaluation.  In addition petitioner also stated he would delay the full employment contact and do the external evaluation and some aspects of the preceptor experience without pay. MaineGeneral would still pay for the experience and travel as they had offered to.  These options are noted in his letter of August 7, 2017.

64) All of these options were rejected by MaineGeneral. Ironically at the Alexander meeting Diaz continued to insist on paying petitioner while then stating they could not pay him for these experiences. This was nothing more than an illusory explanation to cover discriminatory actions.

65) After the meeting, on July 27, 2017, petitioner and Diaz acting for MaineGeneral both wrote letters to the Board proposing a third plan under which petitioner could satisfy the practice aspect of his application for a Maine Medical License.

66) In this proposal the external evaluation proposed and advocated for by MaineGeneral was no longer mentioned.  Now a more intense observational scheme was proposed to occur at Augusta Family Medicine.  (Attachment

67) On August 8, 2017 Alexander responded to petitioner's letter of August 7 suggesting that petitioner should let MaineGeneral know if he no longer wanted to pursue employment with them.  Not contacting MaineGeneral would therefore indicate his desire to pursue employment.

68) One week later Alexander again contacted petitioner via mail now suggesting his failure to contact MaineGeneral meant that he was no longer interested in employment with MaineGeneral.  This conclusion was inconsistent with her previous statements and a clear pretext to provide a rational to cancel the contract with petitioner.

69) Petitioner answered that he was awaiting the decision of the Board of Medicine regarding the revised Back to Practice Program and that his interest had not changed. The Board never responded to the last set of letters sent by Petitioner and MaineGeneral despite several follow up emails by petitioner. This was clearly a result of their friendly relationship with MaineGeneral.  This action by the Board was part and parcel with MaineGeneral's paternalism in which the Board clearly participated. ( Email August 17, 2017)

70) Petitioner also pointed out that Alexander's original email asked that he contact her only if he was not interested in pursuing employment with MaineGeneral.

71) On August 17, 2017 Alexander gave petitioner notice that MaineGeneral was unilaterally canceling the contract between petitioner and MaineGeneral.

Complaint
Peter Garcia v MaineGeneral Health

72) MaineGeneral's interference and lack of support with the Board was the clear cause of petitioner's inability to obtain a Maine Medical License in a timely manner. Then Diaz attempted to coerce petitioner into signing agreements that were unfavorable to petitioner and treated him in a manner distinctly differently from other physicians at MaineGeneral.

73) The inability to obtain a medical license was the final rational MaineGeneral gave petitioner for cancelation of the contract between the parties.   MaineGeneral created an unnecessary program that became more expensive than they thought a disabled, older physician was worth. They convinced the Board of Medicine that an external evaluation was needed and got the Board to approve it.  With an approved plan and a sure path to a medicinal license in place MaineGeneral decided to short circuit the plan and refuse to pay for the external evaluation thus significantly delaying or preventing petitioner from obtaining a medical license.  This was done so that they could void the contact and claim a breach of contact by petitioner.  The rationales presented by Maine General were nothing more than a pretext to their discriminatory actions.

74) MaineGeneral's discriminatory efforts would have been more difficult to complete had it not been for the assistance of the Board of Medicine.  The Board communicated freely with MaineGeneral while avoiding communication with petitioner.   They adopted MaineGeneral's paternalistic thoughts and reentry program.  Their failure to grant a temporary license prevented petitioner from starting his clinical work and provided MaineGeneral with an excuse to do what they wanted to, void the contract with petitioner.

## STATEMENT OF CLAIMS

### Claim One -- VIOLATION OF 42 U.S.C. 12101 (a)(5) PATERNALISM

75) That the Plaintiff hereby realleges and incorporates by reference, paragraphs 1 through 74.

76) Defendant's actions set forth in this complaint constitute discrimination as defined by the Title I of the ADA.

77) Title I of the ADA prohibits discrimination in employment against a qualified person with a disability.

78) Petitioner is deaf and has a cochlear implant.  He qualifies as a person with a disability. He qualified for the job at MaineGeneral for reasons stated above. He can perform the job with or without accommodations.

79) Conflicts between autonomy and paternalism strike at the very heart of civil rights controversies. While embodying many possible meanings, the term "paternalism," as used in this complaint, refers to deliberate interference with an individual's freedom of choice, contrary to his express wishes, and under the guise of acting for his own good.

80) The ADA assumes that discrimination occurs against people with disabilities primarily because of stereotypes, discomfort, misconceptions, and unfounded fears about increased costs and decreased productivity. (H.R. REP. No. 101-485, pt. III at 447.)

81) Courts have interpreted federal employment discrimination statutes to prohibit paternalistic employment policies. The Supreme Court's interpretation of Title VII in *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), and *International Union, United Auto. Aerospace & Agric. Implement Workers of Am., UAW*

*v. Johnson Controls, Inc.,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). These same principals apply to the ADA.

82) An employer is obviously required to incur specific demonstrable costs in order to accommodate a disabled worker, such as a blind or deaf employee who requires a reader or translator. In the present case when MaineGeneral determined that an external evaluation was needed to determine petitioners practice skills, MaineGeneral offered to pay for it and was required to pay for it. Petitioner agrees that he would be less productive in a new environment for a period of time, as are all new employed physicians.

83) Alexander at the July 24 2017 meeting clearly stated MaineGeneral invests a significant amount of time and money to train new physicians so that they may acclimate to the new environment. MaineGeneral refused to treat petitioner in a similar manner because of his disability and age. MaineGeneral viewed petitioner as being inferior and nonproductive.

84) The extra cost of employing disabled workers (whether from additional time lost to sickness or from excessive turnover from medical retirement) is a legally inadequate justification for disability-based discrimination. In fact, in Echazabal, the Ninth Circuit made this precise point. Speaking to the extra cost justification for the EEOC's expanded regulations, the court correctly observed that neither a fear that hiring a disabled individual will cost more nor the extra cost of employing disabled individuals would in itself provide an affirmative defense to a discriminatory refusal to hire those individuals. *Echazabal v. Chevron USA, Inc.*, 226 F.3d 1063, 1070 (2000).

85) Paternalism is perhaps the most pervasive form of discrimination faced by people with disabilities. The antipaternalistic purpose of the ADA addresses the societal concern with many negative depictions of people with disabilities such as inferior and unproductive.

86) In the current case treatment of petitioner can accurately be described as paternalistic. (See Letter of August 7, 2017  Attachment D)  Such paternalistic bias is common in medicine when it comes to disabled patients. This is simply an extension of that bias demonstrating ignorance regarding the thoughts and capabilities of individuals with disabilities.  (See attached article Attachment E)

87) MaineGeneral and the Board of Medicine had extensive dialogs and made decisions about petitioner without his knowledge or consent. They decided what was best for him without the required individual assessment favored by the ADA and supporting case law under the guise of benevolence and acting for his own good.

88) The Board and MaineGeneral determined petitioner needed a remedial program to demonstrate he could practice medicine.  MaineGeneral unilaterally determined the program needed to be six months in length. Then MaineGeneral determined there would need to be an external evaluation of petitioner's medical skills.  MaineGeneral had no contact with petitioner when making these decisions and the decisions were clearly the result of bias and stereotypes.

89) MaineGeneral proposed a program to the Board of Medicine which contradicted the proposal by petitioner and convinced the Board of Medicine to ignore petitioner's thoughts on the matter in an overtly paternalistic manner. The Board of Medicine was a willing partner in this process and assisted MaineGeneral at every opportunity.

Complaint
Peter Garcia v MaineGeneral Health

90) Once MaineGeneral understood the costs of the program they created and promoted MaineGeneral attempted to coerce petitioner into accepting a new contact paying much less based on stereotypical thoughts that disabled employees are somehow less productive and valuable.

91) Petitioner never received the individual evaluation of his skills that is required by the antipaternalistic mandate of the ADA.   The ADA allows paternalistic employment actions only after an individual assessment and that assessment demonstrates the employee is a danger to himself of others.  An individual assessment was scheduled but when MaineGeneral understood that its preconceived notions of inferiority and unproductively regarding petitioner were unlikely to upheld by an independent examiner they backed out attempting to hide behind misapplications of the "Stark Laws."

92) No other new employed physicians at MaineGeneral, who are also clearly less productive initially, are faced with this demand.  This was nothing more than economic paternalism portraying disabled older worker as less efficient and valuable. When petitioner refused to void his current contact and sign a less advantages one, he was terminated.

93) The Board of Medicine for its part assisted MaineGeneral at every opportunity.  It reinforced the negative perceptions of inferiority and unproductive. Board employees and the Board itself refused to meet with petitioner on several occasions to clarify some of the complex issues in this case. Had extensive discussions regarding petitioner and what was best for him while refusing to communicate with him. Letters and emails to the Board by petitioner were routinely not answered.

94) The Board refused to act on the July 27 letters from petitioner and MaineGeneral requesting alternations in the plan approved earlier Without discussion MaineGeneral changed its position with regards to payment for the external evaluation experience after petitioner addressed the complete issue in his email of July 20, 2017.

95) The revised plan called for the Board to issue a temporary license which had been essentially automatic in previous cases. This treating petitioner, a person with a disability, different from previous applicants for the reentry program and denying him an essential service provided by a public entity. This was undoubtedly done to assist MaineGeneral in preventing petitioner from acquiring a license to benign his employment and provide MaineGeneral with a rational to cancel his employment contact.  The Boards inactions were a key factor in petitioner's inability to begin employment with MaineGeneral.

Claim Two – Age Discrimination

96) The Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 631(a), prohibits an employer from discriminating on the basis of age if that person is over 40 years old.

97) The Age Discrimination in Employment Act of 1967 (ADEA) protects individuals who are 40 years of age or older from employment discrimination based on age. The ADEA's protections apply to both employees and job applicants. Under the ADEA, it is unlawful to discriminate against a person because of his/her age with respect to any term, condition, or privilege of employment, including hiring, firing, promotion, layoff, compensation, benefits, job assignments, and training.

98) Courts have set forth very precise elements necessary to prove a prima facie case of age discrimination with indirect evidence. "To proceed under the McDonnell Douglas

framework, a plaintiff must first show that (1) she is over 40, (2) she is qualified for the position in question, (3) she suffered an adverse employment decision, and (4) she was replaced by a sufficiently younger person to create an inference of age discrimination. Elwell v. PP & L, 47 Fed.Appx. 183 (3d Cir.2002), quoting Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir.1995).

99) In the present case petitioner is 62 years of age.  He is qualified for the position as he was offered a contact to perform the job after the interview process. He suffered an adverse employment decision when the employment contract he signed was unilaterally canceled by MaineGeneral. The current replacement and in the future will be replaced by someone sufficiently younger.

Claim Three -- Retaliation

100)    It is unlawful to retaliate against an individual for opposing employment practices that discriminate based on disability or age or for filing an age discrimination charge, testifying, or participating in any way in an investigation, proceeding, or litigation under the ADA or ADEA.

101)    To establish a prima facie case of retaliation under the ADA or the ADEA, plaintiff must show: "1) protected employee activity; 2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and 3) a causal connection between the employee's protected activity and the employer's adverse action." Krouse v Am. Sterilizer Co., 126 F.3d 494, 500 (3rd Cir 1997).

102)    In the current case petitioner brought to the attention of MaineGeneral the paternalistic treatment he had received in letter and in the meeting with Diaz and Alexander. Based on this involvement in a protected activity MaineGeneral canceled the

employment contact, an adverse employment action.  There was a clear nexus between the protected activity and the adverse employment action.

<u>DEMAND FOR A JURY TRIAL</u>

WHEREFORE, PLAINTIFF PETER GARCIA demands a Jury Trial on all questions of law and fact raised in the complaint and respectfully requests that this court enter judgment against Defendant as follows:

A. Declare that Defendant has violated 42 U.S.C. §12112 et seq. and discriminated against plaintiff because of his age and disability.

B. Award actual, compensatory, punitive and statutory damages suffered by the Plaintiff;

C. Award the Plaintiff fees and costs for having to proceed on the present action.

D. Any further relief this Court deems just and proper.


Dated: 10 Jan 2018

Peter Garcia, Pro Se
 2030 Stone Cross Circle
Orlando, FL  32828